IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 18-cv-0466-WJM-KLM

RECONSTRUCTION EXPERTS, INC.,

    Plaintiff,

v.

JEREMIAH FRANKS,

    Defendant.

---

# ORDER DENYING "RENEWED MOTIONS FOR EXPEDITED DISCOVERY AND PRELIMINARY INJUNCTION"

---

Plaintiff Reconstruction Experts, Inc. ("RE") sues a former employee, Jeremiah Franks ("Franks"), for causes of action related to alleged breach of noncompete and nondisclosure covenants in Franks's employment contract with RE. (*See* ECF No. 1-1.) Currently before the Court is a single filing titled "Plaintiff's Renewed Motions for Expedited Discovery and Preliminary Injunction" ("Renewed Motion"). (ECF No. 23.) This motion seeks a ruling on two motions RE filed in Colorado state court before Franks removed this action to this Court, namely, RE's Motion for Expedited Discovery ("Discovery Motion") (ECF No. 1-2) and RE's Motion for Temporary Restraining Order and Preliminary Injunction ("TRO/PI Motion") (ECF No. 1-3).

RE presents a colorable case under the likelihood-of-success prong of the preliminary injunction standard. In particular, Franks's purported denials of RE's accusations are so oddly worded that they strongly suggest Franks has in fact breached his noncompete or nondisclosure covenant, or both. However, RE fails to present even

a *prima facie* case of ongoing or impending irreparable harm. Thus, a preliminary injunction is not appropriate and RE's interconnected request for expedited discovery is, accordingly, moot. The Renewed Motion will be denied.

## I. BACKGROUND

### A. Undisputed Facts

Based on the currently operative complaint (the First Amended Complaint, ECF No. 14) and Franks's answer (ECF No. 19), the following is undisputed:

RE is a Colorado corporation with its principal place of business in Arvada, Colorado. (ECF No. 14 ¶ 1.) Franks is a Texas resident. (*Id.* ¶ 2.)

RE is in the business of reconstruction, restoration, remodeling, and litigation support. (*Id.* ¶ 8.) It is a licensed contractor at least in California, Colorado, and Texas. (*Id.*)

Franks joined RE in 2002. (*Id.* ¶ 9.) He was regularly promoted to positions of higher authority within the company. (*Id.* ¶ 10.) In 2011, he was promoted to Vice President of Southwestern Operations. (*Id.* ¶ 13.) On February 16, 2012, Franks executed the "Employment Agreement" with RE. (*Id.* ¶ 4.)

The Employment Agreement contains, among other things, provisions regarding confidential information and trade secrets, nondisclosure, and noncompetition. As to confidential information, it sets up a defined term—"Confidential Information in Materials"—meaning

> all information, processes, technical information, all financial and related documentation, Client lists, Client contracts, contact information, price lists, job costs, pricing and bid methods, supplier lists, marketing plans, financial information, software or improvements, job orders, records, forms, computer printouts, market information, know-how,

2

unique methods of operation for a repair contracting business and other information that is not generally known to the public and which gives RE or its Affiliates an advantage over competitors who do not know or use the information, and all other non-public compilations of information which relate to the business of RE or its Affiliates.

(ECF No. 19-1 § 2(a).) The "Confidential Information in Materials" phrase is then employed in the nondisclosure and noncompete provisions:

> (e) Upon and after termination of his employment with RE, Employee shall not use for any purpose whatsoever, disclose or retain any of the Confidential Information and Materials and shall not take with him any products or things embodying any Confidential Information and Materials or any originals or copies thereof. Additionally, Employee shall not convey, transmit, communicate, transfer or sell to any person any of the Confidential Information and Materials by copies or otherwise.
>
> (f) Employee will not, for a period of two (2) years from the date of termination of employment for whatever reason or cause, either directly or indirectly, as an employee, consultant, investor or owner: (1) solicit, market, contact, call or interfere with or accept business or do business with any client or customer of RE with whom Employee worked at any time within one (1) year preceding termination of Employee's employment at RE; (2) provide direct or indirect services to a Competitor, whether as an employee, consultant, independent contractor, agent, or owner; (3) attempt to solicit for employment any person who is, at the time of such solicitation, employed by RE or being considered for employment with RE; (4) try to induce any employee of RE or an RE Affiliate to leave his/her employment with RE or the RE Affiliate. For purposes of this Agreement, a "Competitor" shall mean any person or entity that competes or is actively preparing to compete in a state in which RE or any of its Affiliates does business, with any service or business of RE or any of its Affiliates, and specifically including, but not limited to, repair contracting, reconstruction, restoration, insurance repair and destructive testing or real estate and its improvements. Employee acknowledges and agrees that the restrictions contained in this Section 10(f) are reasonable in scope and duration and are necessary for the protection of RE's Confidential Information identified above.

(*Id.* §§ 10(e)–(f).)

As for remedies, the Employment Agreement provides as follows:

> In the event of a breach or a threatened breach by Employee of any of the restrictive covenants contained herein, RE and/or its Affiliate, in addition to all other available remedies, may without notice to Employee, apply to any court of competent jurisdiction for the entry of an injunction restraining Employee from breaching said restrictive covenant(s). The parties agree that injunctive relief is a necessary remedy and that a breach of a restrictive covenant will result in irreparable harm to RE. In addition to injunctive relief for the breach of said covenant(s), RE shall be entitled to recover its training or other development expenses for Employee, consequential damages, and any other damages it may be able to establish. Employee acknowledges that damages for his breach of the restrictive covenants contained herein would be difficult to prove and may be incapable of proof in accordance with applicable law. Accordingly, Employee agrees that, in addition to any other remedies that may be available to RE: (i) in the event that RE establishes that Employee has breached the provisions of Sections 10 (a), (c), (e), (f)(2), (f)(3), (i) or (j) hereof, RE shall be entitled to recover liquidated damages in the amount of the compensation paid by RE to Employee in the twelve months preceding termination of his employment at RE; and (ii) in the event that RE establishes that Employee has breached the provisions of Section 10(f)(1) hereof, RE shall be entitled to recover liquidated damages in the amount of RE's net receipts from such Client in the year preceding the termination of Employee's employment at RE. In the event that RE is required to seek injunctive relief, or seek enforcement of this Agreement in any way, it shall be entitled to recover against Employee all of its attorneys['] fees and costs.

(*Id.* § 10(k).)

On July 6, 2017, Franks announced his forthcoming resignation from RE, and his actual last day of work was August 25, 2017. (ECF No. 14 ¶ 48.)

**B.     Allegations & Responses**

RE alleges that, sometime in July or August 2017, Franks (still employed by RE

at that time) told fellow employee Alison Kronebusch ("Kronebusch") that he would soon be quitting and going into business with Josh Schilling ("Schilling"), RE's founder and former president.[1] (*Id.* ¶ 46.) Franks then supposedly asked Kronebusch to join him in that plan. (*Id.*) In an affidavit opposing the TRO/PI Motion, Franks counters that he "never solicited any RE employees to work for [him] or Joshua Schilling prior to leaving RE." (ECF No. 16-2 ¶ 11.)

As noted above, Franks departed RE in late August 2017. RE claims that Franks announced he was quitting to focus on religious ministry. (ECF No. 14 ¶ 49.)

RE claims that Schilling then founded a new company, Tailored Reconstruction Services ("Tailored"), in Florida by filing articles of incorporation there on September 21, 2017. (ECF No. 14 ¶¶ 62, 64.) Franks admits he and Schilling are co-owners of Tailored. (*Id.* ¶ 65, ECF No. 19 ¶ 3.) RE asserts that Tailored provides the same services as RE. (ECF No. 14 ¶ 68.)

The obvious insinuation of RE's contentions thus far is that Franks departed RE knowing that he would join Schilling at a new competing business. As to that insinuation, Franks says he decided to leave RE "for personal reasons"; that, "[a]t the time [he] left RE, [he] did not have a business relationship with Joshua Schilling"; but he co-founded Tailored with Schilling "[s]ome time after leaving RE." (ECF No. 16-2 ¶¶ 3, 5, 6.) He continues, "Knowing that RE conducts business in California, Colorado and Texas, Tailored was formed with the specific intent not to perform work in those states for two years [*i.e.*, the term of his noncompete covenant]." (*Id.* ¶ 7.)

RE alleges that Franks, on behalf of Tailored, has pitched Tailored's services to a

---

[1] It is not clear when Schilling departed RE.

5

Florida high rise condominium project known as "Peninsula." (ECF No. 14 ¶ 77.) RE claims that this was a violation of various restrictive covenants in the Employment Agreement because Franks had developed marketing materials for the Peninsula project while working at RE and had "represented RE in marketing RE to perform the work on Peninsula." (*Id.* ¶ 76.) Franks responds that he had begun trying to develop the Peninsula account for RE in "early 2016" but RE's CEO eventually informed him "that RE was not prepared to begin conducting work in Florida and denied [his] request to aggressively pursue the project." (ECF No. 16-2 ¶ 14.)

RE further alleges that, "[w]hile employed by RE, Franks was aware that RE developed marketing materials and met with Delta Airlines in Houston, Texas[,] in an attempt to gain their future business." (ECF No. 14 ¶ 79.) But, says RE, "Franks is currently providing or did provide construction services on a remediation project for Delta Airlines in Houston." (*Id.* ¶ 80.) Franks responds, "I have not performed any work directly for Delta Airlines." (ECF No. 16-2 ¶ 10.)

According to RE, Franks's co-owner, Schilling, began making calls to a current RE employee, Michael Ruckle ("Ruckle"), in January 2018. (ECF No. 14 ¶ 85.) Schilling allegedly told Ruckle that "he was calling at Franks' direction because Franks could not contact Ruckle under the restrictive covenants in the [Employment] Agreement." (*Id.* ¶ 86.) RE further claims that Schilling revealed a scheme designed to circumvent the Employment Agreement, specifically, he (Schilling) would form companies in Colorado and Texas to compete with RE, and then when the two-year term of Franks's restrictive covenants expired, the companies would merge into Tailored. (*Id.* ¶ 87.) Schilling allegedly "offered Ruckle ownership in the future

6

[companies] and a guaranteed payment [upon merger]." (*Id.* ¶ 88.)

To these accusations, Franks responds, "Since leaving RE, I have not solicited any RE employees to work for me at Tailored. To my knowledge, Joshua Schilling has never solicited an RE employee to work for my company Tailored Reconstruction Services." (ECF No. 16-2 ¶¶ 12–13.) Schilling also submits an affidavit stating that he has "never solicited any RE employees to work for me and Jeremiah Franks at Tailored." (ECF No. 16-1 ¶ 6.)

**C.     Procedural History**

This case was filed in Denver District Court on February 9, 2018. (ECF No. 1-1.) Later the same day, RE filed the Discovery Motion (ECF No. 1-2) and the TRO/PI Motion (ECF No. 1-3).[2] Franks removed to this court on February 23, 2018. The parties completed briefing of the TRO/PI Motion and the Discovery Motion in this Court. RE then filed the Renewed Motion. (ECF No. 23.) RE there stated that the TRO/PI Motion and the Discovery Motion "are fully briefed and ready for consideration." (*Id.* ¶ 5.) In response, Franks asks that no proceedings be set before the June 26, 2018 Scheduling Conference given what Franks calls the "questionable nature of Plaintiff's

---

[2] On February 21, 2018, the state court judge issued the following order: "The motion/proposed order attached hereto: SO ORDERED. [¶] The parties are to confer and file a notice to set this matter for a hearing to address the Plaintiff's motion for TRO and Preliminary Injunction." (ECF No. 7 at 1.) The attached "motion/proposed order" was the entirety of RE's TRO/PI Motion. (*Id.* at 2–19.) RE has since claimed that the state court judge's order amounted to a grant of a TRO and a requirement that Franks "return any of RE's Confidential Information in Materials still in his possession." (ECF No. 23 ¶ 2.)

The Court is frankly mystified both with the state court judge's order and with RE's oddly specific interpretation of it. The state court judge's order makes no sense. It seems to say both that it is granting the entirety of the TRO/PI Motion and that the entire motion also remains under consideration. It certainly says nothing about returning confidential information. As best this Court can tell, the state court judge believed he was granting a request to move the proceedings along to a hearing. In any event, whatever the state court judge ordered, it is most certainly not binding on this Court, and is in any event now superseded by this Order.

7

motions." (ECF No. 27 ¶ 5.)

## II. PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010). A movant must show: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and (4) that the injunction would not adversely affect the public interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). Among those elements, "a showing of probable irreparable harm is the single most important prerequisite." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted).

The Tenth Circuit previously endorsed an alternate standard that relaxed the likelihood of success requirement when the other three factors tipped strongly in the movant's favor. *See, e.g.*, *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006). The Tenth Circuit abrogated this standard in 2016, however, announcing that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

The Court will briefly mention the likelihood-of-success element. Franks argues that RE cannot satisfy that element because, among other reasons, there are too many

8

factual disputes—apparently implying that these many disputes will lead the Court to determine that the case is a toss-up and so a preliminary injunction is inappropriate. (ECF No. 16 at 6–7.) Without prejudging the merits, the Court notes that Franks rarely sets forth any actual dispute. Even before RE's reply brief pointed out as much (*see* ECF No. 20 at 6–8), it was plain to the Court that Franks's and Schilling's affidavits were very carefully worded to look like a denial without actually denying anything of substance. All of Franks's purported denials have some sort of qualification, *e.g.*, he did not solicit employees "to work for [him] or Joshua Schilling" (leaving open the possibility that he may have solicited employees to work for the company they plan to form); he is not performing work "directly" for Delta Airlines; or he has not solicited anyone to work specifically "for my company Tailored Reconstruction Services" while conspicuously failing to address Schilling's purported plan to set up separate companies. (ECF No. 16-2 ¶¶ 10, 13.) One cannot help gain the impression that Franks is attempting to put up the appearance of a defense while avoiding perjury.

But whether Franks has a good-faith defense is a matter for another day, and nothing in this order should be construed as a ruling for or against RE on the merits. *See Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody Lane, LLC*, 2018 WL 1762611, at *5 (D. Colo. Apr. 12, 2018).

**B.     Irreparable Harm**

RE carries the burden of establishing more than just a likelihood of success. As to irreparable harm—"the single most important prerequisite," *Dominion Video*, 356 F.3d at 1260—RE falls short.

RE argues that "numerous cases have recognized that an employer will suffer

9

real, immediate and irreparable harm if its employees are allowed to unlawfully misappropriate confidential and proprietary information in a competing business." (ECF No. 1-3 at 14.) But, with two exceptions, RE makes no effort to specify what nonpublic information, precisely, it believes Franks is using to RE's disadvantage.

The exceptions are the Delta Airlines and Peninsula projects, which Franks has secured or is attempting to secure allegedly by drawing upon his knowledge of confidential information, and otherwise in competition with RE. But it appears that the Delta Airlines project has now become the proverbial "water under the bridge," and to the extent Franks is liable to RE on this account, RE has presented no reason to believe that damages (presumably Franks's profits) cannot be calculated. As for Peninsula, *if* Franks wins the project for Tailored (and RE has not presented a record sufficient to predict how likely that is), then the resulting contract will have a monetary value. Again, RE has given no reason to believe that damages could not be calculated.

RE further asserts that "the types of injuries that Franks is threatening are injuries to RE's relationships and injuries to relationships are exceedingly difficult to repair." (*Id.*) RE here refers both to soliciting employees and soliciting potential clients. (*Id.*) As to potential employees, the record so far shows that Franks has failed to lure anyone from RE. As to potential clients, the relationship would be a business relationship reduced to a monetary value.[3]

RE further claims that "once a trade secret has been disclosed, it is no longer a

---

[3] Even if RE were alleging the possibility that a project like Peninsula could lead to a series of future projects with the same or other clients (RE has not made such an allegation), it does not necessarily mean that damages would become so speculative that injunctive relief is the only practical course. Ongoing monetary remedies (as in some intellectual property cases) may provide suitable redress.

10

secret and it loses all value as such." (*Id.* at 15.) Yet RE fails to specify any trade secrets that Franks threatens to "disclose" (as opposed to use for his advantage).[4]

It is also worth noting that Franks's response specifically calls out RE on its lack of specificity regarding what internal RE knowledge it believes Franks is misappropriating. (ECF No. 16 at 10–12.) Yet RE's reply does not attempt to clarify. (*See generally* ECF No. 20.)

In broader terms, RE's irreparable harm arguments essentially assume that violation of a noncompete clause is presumptively a cause of irreparable harm. Although RE's cited case law at times suggests as much (*see* ECF No. 1-3 at 14–15; ECF No. 20 at 8–9), this case law mostly predates the Supreme Court's and the Tenth Circuit's recent disapproval of presumptions in favor of injunctions. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391–92 (2006); *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1140, 1141–42 (10th Cir. 2017) ("*Malamed*"); *Diné Citizens*, 839 F.3d at 1282. The obvious import of these and other cases is that movants must actually carry their burden under the circumstances of the specific case as to each required factor.

Here, RE's only attempts to demonstrate irreparable harm under the circumstances of the specific case (Delta Airlines, Peninsula, employee solicitation) also

---

[4] At times, RE also points to Franks's alleged contractual stipulations regarding the difficulty in calculating damages and the propriety of injunctive relief. (*See, e.g.*, ECF No. 1-3 at 14; ECF No. 20 at 9.) As to these assertions, the Court agrees within the Southern District of New York's reasoning: "[P]arties to a contract cannot, by including certain language in [a] contract, create a right to injunctive relief where it would otherwise be inappropriate." *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) (citing *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate")).

11

show, on their face, that damages would be an adequate remedy and/or that there simply is no present threat of noncompensable harm. Thus, on the papers themselves, it is clear that RE is not currently prepared to support a claim of irreparable harm. As the Tenth Circuit has stated, "No showing of irreparable harm, no preliminary injunction." *Malamed*, 874 F.3d at 1143 (capitalization normalized; emphasis removed).

## IV. CONCLUSION

For the reasons set forth above, that portion of the Renewed Motion (ECF No. 23) seeking a temporary restraining order and/or preliminary injunction is DENIED, and that portion of the Renewed Motion seeking expedited discovery is DENIED AS MOOT.

Dated this 23rd day of April, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge